IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS (SAN ANTONIO)

| | | |
|---|---|---|
| IN RE Z-2, LLC, | ) | |
| | ) | CHAPTER 11 |
| DEBTOR IN POSSESION, | ) | |
| | ) | |
| | ) | BK: 11-50069-lmc |

| | | |
|---|---|---|
| Z-2, LLC, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | ADVERSARY PROCEEDING #_____ |
| | ) | |
| CIT CAPITAL USA, Inc. | ) | |
| | ) | |
| DEFENDANT. | ) | |

## COMPLAINT

Comes Now the Debtor and Plaintiff, Z-2, LLC, a Florida limited liability company ("Z-2"), brings this action against Defendant, CIT Capital USA, Inc., a Delaware corporation ("CIT"), as follows:

### NATURE OF SUIT

1. This action is brought for damages suffered by the Debtor/Plaintiff as a result of CIT's conduct as detailed in the paragraphs that follow as well as to determine the rights and responsibilities of the parties concerning certain loan documents.

### JURISDICTION

2. This Court has jurisdiction over these claims under 28 U.S.C. §§ 157 and 1334. This matter is related to the bankruptcy case and is a core proceeding as that term is used at 28 U.S.C. § 157.

## PARTIES

3. Z-2 is a Florida limited liability company, doing business in Texas as Z-2 Oil & Gas, Inc., with its principal place of business at 406 South Boulder, Suite 708, Tulsa, Oklahoma 74103. Z-2 is an oil and gas production company which owns the Bigfoot Field in Southern Texas, specifically Frio and Atasaco Counties, Texas.

4. CIT is a Delaware corporation with its principal place of business at 505 Fifth Avenue, 10th Floor, New York, New York 10017. CIT is an investment banking firm which engages in the business of debt and/or equity financing with corporate entities. CIT has appeared in this bankruptcy case and may be served by serving its counsel of record, James Donnell, Winston & Strawn LLP, 200 Park Avenue, New York, NY 10166-4193, by U.S. postage prepaid.

## THE TRANSACTION

5. In the summer of 2008, Z-2 was in negotiations with Texas Capital Bank ("TCB") in Dallas to borrow $31.4 million, utilizing a borrowing base method, as a senior credit facility. An additional facility of $25 million was to be borrowed from CIT for working capital.

6. As negotiations progressed towards the closing of these two credit facilities, TCB and CIT were unable to reach an agreement regarding the terms of an intercreditor agreement. On July 30, 2008, David Bornstein, CIT Vice President ("Bornstein"), advised Z-2 that CIT would loan on both credit facilities, pursuant to the same terms and conditions as those set forth in TCB's term sheet. Z-2 accepted this offer from CIT.

7. Unfortunately, the terms and conditions for the senior facility, in which CIT replaced TCB, were not the same terms and conditions outlined by TCB. However, due to the

timing of these changes, and Z-2's misplaced reliance on Bornstein's representations, Z-2 had no options available to it other than to proceed with CIT as the lender for both credit facilities.

8. These credit facilities were memorialized in the Credit Agreement which documented the senior credit facility, dated August 27, 2008, and the Second Lien Term Loan Agreement which documented the working capital credit facility, dated August 27, 2008, (collectively, the "Credit Agreements").

9. Z-2 is a producer of oil and gas in the Bigfoot Field. Immediately following the closing on August 27, 2008, the price of oil abruptly dropped from an average of $140 per barrel in July 2008 to an average of $36.70 per barrel by January 2009.

10. In November 2008, Jerry Jeram ("Jeram") and Brian Kerrigan ("Kerrigan") with CIT came to Tulsa to meet with Richard Bednar, the Chief Financial Officer for Z-2 ("Bednar"). At that time, Jeram and Kerrigan were advised that the EBITDAX (Earnings Before Interest, Taxes, Depreciation, Depletion, Amortizations and Other Non-Cash Charges) covenant, which was included in the Credit Agreements, would no longer work for Z-2, given the dramatic decrease in the price of oil since August 27, 2008. In fact, Bednar warned that Z-2 would be in default of that covenant by December 31, 2008, if the covenant was not amended or waived. Bednar, on behalf of Z-2, verbally requested a waiver of the EBITDAX covenant. Kerrigan acknowledged Bednar's request and indicated that a waiver of that covenant by CIT would not be a problem.

11. In February 2009, CIT representatives, Jeram, Kerrigan and Bornstein, made a trip to the Bigfoot Field (the "Field") in south Texas and met with Z-2 management and field personnel to review the results of the Field's production since August 27, 2008. All parties were

pleased with the production results from the Field since production had risen to an average of 450 barrels per day. Z-2's technical group then presented to CIT the development plan for the Field going forward ("Development Plan"), and Z-2 was given verbal approval by the CIT representatives to move forward with the Development Plan. The Development Plan included drilling a well in the Olmos "B" zone, with multiple fracs, and three (3) other wells. The AFE (Authorization for Expenditures) for the first well ranged from $750,000 to $1,000,000.

12. Also during that meeting a request was again made for formalization of the waiver of the EBITDAX covenant, for Z-2 management knew such a written waiver would be required by the Z-2 auditors. Once again Kerrigan and Bornstein assured Z-2 management that such a waiver would not be a problem. Based on this second assurance, Z-2 instructed its auditors to begin work on the audit of 2008 activity.

13. In early March 2009, Z-2 submitted a formal, written drawdown request, pursuant to the senior credit facility, for $1.4 million, which was to be funded on March 21, 2009. Z-2 followed the very same practice and procedures it had followed in all previous drawdown requests submitted to CIT. Z-2's agreement with CIT, specifically approved verbally by Jeram, was that the drawdown was to be funded on March 21, 2009, even though work on the approved Development Plan continued during the month of March and expenses were incurred in anticipation of the March funding. At all times CIT was aware of the intended use of the requested funds.

14. Based on the assurances of CIT and the reasonable expectations of Z-2, Z-2 continued its Development Plan. Z-2 incurred approximately $1.5-2.0 million in additional payables. However, on March 19, 2009, <u>two days</u> before the scheduled funding of the

drawdown, Kerrigan called Bednar and told him that the CIT credit department had determined that Z-2 would be out of compliance with its borrowing base, as provided for in the senior Credit Agreement, on April 30, 2009, when the next reserve report was due to CIT. Therefore, according to Kerrigan, CIT would not fund the scheduled drawdown on March 21, 2009. Kerrigan then told Bednar that Bednar could withdraw the request for the drawdown or incur legal fees from CIT if its attorneys had to draft a letter advising Z-2 as to why the drawdown request was being denied. In the face of this statement, and in order to avoid additional fees, Z-2 withdrew the request.

15. As a result of CIT's failure to fund the drawdown, the Development Plan was halted, and Z-2 incurred significant payables which had to be paid out of working capital.

16. In May 2009, believing Z-2 and CIT were mutually working towards resolution of the "borrowing base default issue," Z-2's members made a capital contribution to Z-2 to enable it to pay interest to CIT.

17. In late May 2009, Z-2 and MacQuarie Bank ("MacQuarie") had negotiated a new hedge arrangement which would have made available to Z-2 approximately $900,000 - $1,000,000 for drilling and capital maintenance. At all times CIT was aware of these negotiations. Mere days before the closing of this transaction, CIT issued a "Notice of Default" letter and a "Reservation of Rights" letter to Z-2. These letters caused MacQuarie to terminate the negotiations and impending closing with Z-2.

18. At all times, Z-2 disclosed to and argued with CIT that it was not in default of the borrowing base determination and was not in default of that provision of the senior Credit Agreement.

19. On or about November 1, 2009, CIT's parent company, CIT Group, Inc., voluntarily filed for bankruptcy protection in the US Bankruptcy Court, revealing that during the entirety of 2009 it had been without the necessary funds to advance promised loan funds to Z-2 and others.

## COUNT ONE
## BREACH OF CONTRACT

20. Z-2 alleges and reasserts all of the claims contained in paragraphs 1 - 19 hereof.

21. CIT breached the senior Credit Agreement when it declared Z-2 had a 'borrowing base deficiency' when no such deficiency existed.

22. As a result of this unilateral and wrongful determination made by CIT, Z-2 has incurred substantial financial losses.

23. Accordingly, Z-2 is entitled to recover the actual losses, plus interest, resulting from this breach of contract by CIT.

WHEREFORE, Z-2 asks this Court to enter judgment in its favor against CIT for actual damages resulting from its breach of contract in an amount to be proved at the time of trial.

## COUNT TWO
## BREACH OF ORAL AGREEMENT - EBITDAX

24. Z-2 alleges and reasserts all of the claims contained in paragraphs 1-23 hereof.

25. CIT verbally committed to waive the EBITDAX calculations contained within the credit agreements. It failed to do so. This failure caused financial harm to Z-2.

25. As a result of Z-2's failure to waive this financial covenant in the credit agreements, despite its verbal assurances that it would do so, Z-2 has incurred substantial financial losses.

26. As a result of the breach of the oral agreement regarding the EBITDAX covenant, Z-2 is entitled to recover the actual losses, plus interest, resulting from this breach of oral agreement.

WHEREFORE, Z-2 asks this Court to enter judgment in its favor against CIT for actual damages resulting from its breach of oral contract in an amount to be proved at the time of trial.

## COUNT THREE
## BREACH OF ORAL AGREEMENT - FAILURE TO LEND

Z-2 alleges and reasserts all of the claims contained in paragraphs 1-26 hereof.

27. CIT's verbal commitments and other representations led Z-2 to believe CIT would fund the drawdown requested and to be funded on March 21, 2009.

28. As a result of CIT's failure to fund the March 21, 2009 drawdown, Z-2 has incurred substantial financial losses.

29. As a result of this breach of oral agreement regarding the March 21, 2009 drawdown, Z-2 is entitled to recover the actual losses, plus interest, resulting from this breach of oral agreement.

WHEREFORE, Z-2 asks this Court to enter judgment in its favor against CIT for actual damages resulting from its breach of oral contract in an amount to be proved at the time of trial.

## COUNT FOUR
## EQUITABLE ESTOPPEL

Z-2 alleges and reasserts all of the claims contained in paragraphs 1-29 hereof.

30. CIT knew at all times that Z-2 was incurring expenditures for the Development Plan, prior to March 2009.

31. CIT knew that Z-2 was relying on CIT's representations of funding for the March

21, 2009 drawdown, and CIT sat idly by and allowed Z-2 to incur these expenditures.

32. CIT knew that Z-2 would include significant expenses, which would create financial difficulties for Z-2 if Z-2 did not receive the drawdown funding (or the MacQuarie funding).

33. As a result of CIT's actions, CIT is equitably estopped from foreclosing on the properties securing the debt created under the Credit Agreements and equitably estopped from seeking repayment of any of the monies advanced pursuant to the Credit Agreements.

## COUNT FIVE
## ATTORNEYS' FEES

34. Plaintiff has been required to engage the services of bankruptcy counsel in order to pursue this matter.

35. Plaintiff seeks the recovery of its attorneys' fees incurred in this matter pursuant to Section 38.001 (8) of the Texas Civil Practice and Remedies Code which provides for recovery of attorneys' fees in actions on contracts executed in the State of Texas.

WHEREFORE, Z-2 requests an award of reasonable attorneys' fees.

## **PRAYER**

Debtor, Z-2, requests the Court to grant it relief as set out above and for such other and further relief which it may show itself entitled.

DATED this ____ day of April, 2011.

        Respectfully submitted,

        LANGLEY & BANACK, INCORPORATED
        745 E. Mulberry, Suite 900
        San Antonio, TX 78212
        Telephone: (210) 736-6600
        Facsimile: (210) 735-6889

        By: _____
        R. GLEN AYERS, JR.
        State Bar No. 01467500
        ALLEN M. DeBARD
        State Bar No. 24065132

        ATTORNEYS FOR THE DEBTOR

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing has been mailed by facsimile transmission and/or U.S. First Class Mail to James Donnell, Winston & Strawn LLP, 200 Park Avenue, New York, NY 10166-4193, ____ day of April, 2011.

_____
R. GLEN AYERS, JR. or
ALLEN M. DeBARD